## Nicoulin v. O'Brien.

(Decided November 29, 1916.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, First Division).

1. States—Territorial Extent—Boundaries of States—Navigable Waters.—Where a river is the boundary between two nations or states, if the original property is in neither, and there is no convention respecting it, each holds to the middle of the stream; but, when one state is the original proprietor of the territory on both sides of the river and grants the territory on one side only, it retains the river within its own domain, and the newly created state extends to the river only.

2. States—Territorial Extent—Boundaries.—Prior to her cession of the Northwestern Territory to the United States in 1784, Virginia, as the owner of the lands on both sides of the Ohio river, possessed the domain, empire, sovereignty and jurisdiction over that part of the Ohio river which flowed through her territory.

3. States—Territorial Extent and Boundaries — Sovereignty Over Ohio River.—By her cession of her territory lying northwest of the Ohio river to the United States, in 1784, the domain, empire, sovereignty and jurisdiction of Virginia over the Ohio river did not pass, but remained in that state and passed to Kentucky upon its organization as a state, in 1792.

4. States—Police Powers of.—Every state has the right to enforce its own laws within its boundaries.

5. States—Jurisdiction of Kentucky Over Ohio River.—The proprietorship of Kentucky and its attendant jurisdiction over the Ohio river are subject only to the limitations laid thereon in the compact of 1789 between Virginia and Kentucky, which provides, among other things, that the jurisdiction of Kentucky over the Ohio river shall be concurrent only with the states which may possess the opposite shores of the river.

6. States—Jurisdiction Over Ohio River.—The concurrent jurisdiction granted to Kentucky and Indiana by the compact of 1789 between

Virginia and Kentucky over that portion of the Ohio river which flows between them, does not include the sovereignty or ownership of the river; it was conferred, not for the purpose of destroying the title of either sovereign, but to render more efficient the policing of the stream.

7. States—Jurisdiction Over Ohio River.—The concurrent jurisdiction granted to Kentucky and Indiana by the compact of 1789 between Virginia and Kentucky, over that portion of the Ohio river which flows between them, means the jurisdiction of each state, acting separately in the execution of its own laws, and not the jurisdiction of the two states acting jointly in the execution of laws agreed upon by both states.

8. Fish—Police Power of State With Reference to Fish and Game.— By reason of a state's control over fish and game within its limits it is within the police power of its legislature, subject to constitutional restrictions, to enact such general or special laws as may be reasonably necessary for the protection and regulation of the public's right in its fish and game, even to the extent of restricting the use of, or right of property, in the game after it has been taken or killed.

9. Fish—Constitutional Law—Act for Protection of Fish and Game— Ohio River as Boundary.—Chapter 29 of the acts of 1916 (Acts 1916, 340), entitled "An Act for the protection of fish; providing methods for catching thereof, and fixing penalties for violation thereof," is constitutional in its application to persons fishing in the Ohio river where it forms the boundary between Kentucky and Indiana, although Indiana has never agreed or consented to the act, and has no statute of the same import.

E. A. LARKIN and RICHARD PRIEST DEITZMAN for appellant.

JOSEPH G. SACHS, JR., for appellee, Kentucky Game and Fish Commission, Amicus Curiae.

JOHN J. SULLIVAN, Assistant County Attorney.

OPINION OF THE COURT BY CHIEF JUSTICE MILLER— Affirming.

This case presents the interesting question as to what is the precise nature and extent of that concurrent jurisdiction granted to Kentucky and Indiana over the Ohio river, by the compact with Virginia. The facts from which the present controversy arose are as follows:

On August 4th, 1916, the plaintiff, Frank Nicoulin, was arrested and tried before the appellee, John J. O'Brien, a justice of the peace for Jefferson county, who was the defendant below, on the charge of seining for fish in the Ohio river, where it forms a part of the boun-

dary line between Jefferson county, in Kentucky, and the State of Indiana, and at a point on the Ohio river more than one hundred yards from the low water mark of the Ohio river on the Indiana side.

The warrant was issued pursuant to subsection 2 of Chapter 29 of the Acts of 1916, making it unlawful for any person to fish in any of the waters of the state, except in private ponds, by the use of a seine or any contrivance, other than is permitted by the act. Acts 1916, p. 340.

Upon the trial Nicoulin was found guilty and fined $15.00, and the costs of the prosecution. No appeal lying from that judgment by reason of the amount of the fine (it being less than $20.00), Nicoulin brought this action in the Jefferson circuit court to prohibit O'Brien from enforcing the judgment, upon the ground that the Act of 1916, *supra*, was invalid and ineffectual, and that O'Brien was, for that reason, without jurisdiction to enter the judgment imposing the fine.

There is no dispute about the facts; Nicoulin admits that he was seining in the Ohio river at a point which was more than a hundred yards this side of the low water mark on the Indiana shore. He contends, however, that the Act of 1916, *supra*, is ineffectual because Kentucky and Indiana, having concurrent jurisdiction on the Ohio river at the point where he was fishing, the Act of 1916 had never been concurred in by the State of Indiana. In other words, Nicoulin's contention is that "concurrent jurisdiction" means "joint jurisdiction;" and, that when applied to the jurisdiction of Kentucky to enact penal laws applicable to the Ohio river, the phrase "concurrent jurisdiction" can only mean the power to enact such criminal statutes as are formally agreed to or acquiesced in by the State of Indiana, or such as were in force within its jurisdiction at the time the Kentucky statute was passed.

The circuit court, however, took a different view of the law of the case and denied the writ of prohibition. From that judgment Nicoulin prosecutes this appeal.

By a statute of Indiana it is declared that whoever shall catch fish in any of the waters of that state by means of a seine, shall be fined and imprisoned; but, this statute, by its terms, applies to the Ohio river only at points within one hundred yards of the mouth of any

stream emptying into said river from the Indiana side. Burns' Ann. Ind. Sts. 1908, sec. 2541.

A full and correct understanding of the case may be aided by a brief historical review of the legislation by Virginia which led up to the creation of the State of Kentucky and its admission into the Union, in 1792.

In colonial times the present States of Kentucky and Indiana, and other states north of the Ohio river, constituted a part of the territory of Virginia. At the breaking out of the Revolution, Fincastle county comprised the portion of Virginia west of the Alleghany Mountains and south of the Ohio river. In 1776, in the first year of the Commonwealth of Virginia, Fincastle county was abolished and its territory cut up into the counties of Kentucky, Washington, and Montgomery. 9 Hening's Sts. Lar. 257, 1 Litt. Laws of Kentucky 626, Carroll's Ky. Sts. (1915), sec. 186.

Kentucky county as thus constituted comprised the territory of the present State of Kentucky, which was further cut up in 1780, into the three counties of Jefferson, Lincoln, and Fayette. At this time Virginia, being the owner of the territory on both sides of the Ohio river, also owned that river as completely as Kentucky now owns Green river, or Kentucky river, which flow through its territory.

Pursuant to negotiations begun in 1781 with the federal government as it then existed under the Articles of Confederation, Virginia, in 1784, ceded to the federal government all of its territory "situated, lying and being to the northwest of the Ohio river," upon the condition that it should be divided into three or more states to become a part of the federal Union. 8 Fed. Sts. Ann. 17, 11 Hening Sts. Lar. 320.

This left the Ohio river in its original position as to ownership; it still belonged to the State of Virginia.

The relation of the State of Virginia to the Ohio river, and the relation of Kentucky thereto after it became a state, was well stated by Chancellor Bibb, in his opinion delivered upon the trial of McFarland v. McKnight, in the Louisville Chancery Court, and printed at the direction of the Court of Appeals in 6 B. M. 500, as its opinion, upon the appeal.

Chancellor Bibb said:

"Formerly the State of Virginia owned the lands on both sides of the Ohio river, from the northern boun-

dary line of Virginia to the mouth of the Ohio, and exercised over the river the right of domain, empire, sovereignty, and jurisdiction. This possession on both sides of the river, gave to Virginia, according to the principles of the law of nations, the domain, empire, sovereignty and jurisdiction over that part of the Ohio river flowing through her territory. The right of passage upon the Ohio river, through the State of Virginia, for the purposes of navigation, trade and commerce, which belonged to others not citizens of Virginia, as well as to her own citizens, are held in subordination to the general domain, empire, sovereignty and jurisdiction of the State of Virginia. Crimes and wrongs against the public or against individuals, committed and done on the Ohio, from the northern boundary of Virginia to the mouth, were properly cognizable by the State of Virginia, to prohibit, punish, and redress. The right of passage and use, for the lawful and innocent purposes of navigation, trade, and commerce, did not take away the sovereignty and jurisdiction of the State of Virginia, to legislate and prohibit those using the passage and water of the Ohio river, within her territory, from doing mischief to the State or her citizens, or foreigners or their property, within the limits of Virginia."

In the same opinion it is further said:

"The State of Virginia ceded to the United States the territory lying northwest of the Ohio river. By this cession the domain, empire, sovereignty and jurisdiction of Virginia over the river Ohio, did not pass, but remained in that state. By the erection of Kentucky into an independent state, by the compact between Virginia and Kentucky, and the limits assigned to the new state, and the assent of the Congress of the United States to that compact, Kentucky, as a State, became invested with the domain, sovereignty and jurisdiction over the Ohio river, from its mouth up to Big Sandy river, as fully as formerly held and possessed by the State of Virginia.

"By this right of domain, sovereignty and jurisdiction, the whole power, legislative, executive and judicial, belongs to the State of Kentucky, over the waters of the Ohio river to the northwestern shore or bank, along its course from the mouth of Big Sandy river to the mouth of the Ohio river; and this power and jurisdiction is plenary, to define and to punish crimes and offenses

against the public peace, and to prohibit and redress wrongs, the better to protect and foster the proper and innocent purposes of navigation, trade and commerce. The act of Kentucky in question is cautiously framed, so as to designate that part of the Ohio river which is within the limits and rightful jurisdiction of this state, and no more. It is a solemn duty which Kentucky owes to other states and nations, and to her own citizens in particular, to take care that the right to use the river within her limits, for the innocent, commendable and rightful purposes and natural ends of navigation, trade and commerce, be not perverted and abused to means of annoyance and mischief. This duty is incumbent on her as a civilized state, having place among the nations and governments of this earth; it is a moral duty which she owes, particularly to her own citizens.''

This view was expressed by Chief Justice Marshall in writing the opinion for the court in Handly v. Anthony, 5 Wheat. 694, where, in speaking of the cession of the Northwest Territory by Virginia, he said:

''She conveys to Congress all her right to the territory 'situated, lying, and being, to the northwest of the river Ohio,' and this territory, according to express stipulation, is to be laid off into independent states. These states, then, are to have the river itself, wherever that may be, for their boundary. This is a natural boundary, and in establishing it, Virginia must have had in view the convenience of the future population of the country.

''When a great river is the boundary between two nations or states, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in this case, one state is the original proprietor, and grants the territory on one side only, it retains the river with its own domain, and the newly created state extends to the river only.''

The cession then of Virginia's domain ''northwest of the Ohio river'' being clearly exclusive of that stream, left her proprietorship unaffected; and, Kentucky's proprietorship upon its creation as a state, was the same. McFarland v. McKnight, *supra;* Blanchard v. Porter, 11 Ohio 138.

It has become a well recognized rule of construction that where a river separates two states, if one of them was the original proprietor of the lands on both sides,

and ceded the land on the opposite side, the grant running from the river, the original proprietor is deemed to have retained the stream, unless the contrary intent clearly appears; but, where neither state was the original proprietor, then the territory of each runs to the middle line of the main channel, in the absence of a contrary agreement. Handly v. Anthony, *supra;* Howard v. Ingersoll, 13 Howard 381; Fleming v. Kenney, 4 J. J. M. 158.

Consequently, it has been settled for more than a century that after the cession of the Northwest Territory, Virginia remained the proprietor of the Ohio river and its bed to low water mark on northwestern shore, and that Kentucky succeeded to this proprietorship from her eastern line westward to the Mississippi river. Handly v. Anthony, *supra;* Fleming v. Kenny, *supra;* Church v. Chambers, 3 Dana 279; McFarland v. McKnight, *supra;* McFall v. Commonwealth, 2 Met. 394; Louisville Bridge Co. v. Louisville, 81 Ky. 189; Indiana v. Kentucky, 136 U. S. 1.

The proprietorship of Kentucky and its attendant jurisdiction are subject only to the limitations that were laid thereon in the compact between Virginia and Kentucky. That compact was finally embodied in an Act of the General Assembly of Virginia, passed December 18th, 1789, and contains the terms and conditions upon which Kentucky was erected into an independent state. The seventh clause of the compact reads as follows:

"The use and navigation of the river Ohio, so far as the territory of the proposed state, or the territory which shall remain within the limits of this Commonwealth, lies thereon, shall be free and common to the citizens of the United States, and the respective jurisdictions of this commonwealth and of the proposed state, on the river as aforesaid, shall be concurrent only with the states which may possess the opposite shores of the said river." 13 Hening's St. Lar., p. 19; Carroll's Ky. Sts. 1915, p. 29.

The compact with Virginia was, by reference, specifically incorporated into the first three constitutions of Kentucky. Const. 1792, Art. 8, sec. 7; Const. 1799, Art. 6, sec. 9; Const. 1850, Art. 8, sec. 9. And, although the federal government made no objection to the constitution of 1792, which made the compact with Virginia a part of its fundamental provisions, and never formally approved that constitution, nevertheless Kentucky en-

tered the federal Union under its constitution of 1792, by virtue of the anticipatory Act of Congress approved February 4th, 1791, which had declared that upon the first of June, 1792, the new State of Kentucky would be admitted as a new and entire member of the United States of America. 1 U. S. St. Lar. 189.

So, the limitation upon Kentucky's exclusive ownership and jurisdiction of the Ohio river is to be measured by the meaning we shall give the words "concurrent jurisdiction" as used in the Virginia compact, *supra.*

There have been many cases in which the words "concurrent jurisdiction" have been defined generally, or defined in connection with particular facts. A majority of these decisions have arisen in cases where the middle thread of the stream constituted the boundary between states, thus leaving to each state the ownership of a portion only of the bed of the river.

The peculiar character, however, of the Ohio river, lying, as it does, entirely within the boundary of the State of Kentucky, clearly differentiates it from other dividing waters, such as the Columbia, the Mississippi, the Missouri, and the Hudson rivers, whose middle threads divide the territories of the respective states occupying their opposite shores.

It should not be forgotten that "concurrent jurisdiction" does not include the sovereignty or ownership of the river. That jurisdiction is conferred, not for the purpose of destroying the title of either sovereign, but to render more efficient the policing of the stream, and to prevent the loss and confusion which would result from defeating actions by pleas to the jurisdiction, when it might be difficult to determine precisely where the act occurred.

It would, however, be a harsh rule that would give each State the power to exclusively establish its own laws over the entire water, regardless of its boundary line, because laws might be enacted which were diametrically opposed. For example, the laws of one state might favor slavery, and pass an act providing that any one who attempted to aid the escape of a slave by transporting him across the boundary river, should be guilty of a misdemeanor; while the other state might be opposed to slavery and make it a misdemeanor to refuse to assist the escape of a slave. Such a condition would plainly defeat the very purpose for which the concurrent juris-

diction over the stream was granted. And, giving this idea a universal application, it was said In Re Mattson, 69 Fed. 535, that the concurrent jurisdiction of a state to enact penal laws respecting a river forming the boundary between it and another state means the power to enact such criminal laws as are agreed to, or acquiesced in, by such other state, or are in force within it.

Appellant contends that the rule announced in the Mattson case, supra, and followed in Ex Parte Desjeiro, 152 Fed. 1004, is applicable, and controlling in this case. In those cases the court said that the word "concurrent," in its legal and generally accepted definition, means acting in conjunction, and when applied to the jurisdiction of Oregon to enact penal laws for the Columbia river, it could only mean the power to enact such criminal statutes as are agreed to, or acquiesced in by the State of Washington, or, as are already in force within its jurisdiction.

And, applying the rule to the facts of those cases, the court in each instance held that a criminal law of one state could not be enforced upon any part of the Columbia river, which was the dividing line between the states, unless the law had been agreed to or acquiesced in by the other state.

It would seem, however, that the jurisdiction must be somewhat broader than this. A state should not be lightly held to have surrendered its right to enact laws which it can enforce to the limits of its boundary, or which can be enforced against its own citizens.

It is an elementary proposition that a state may authorize or forbid the doing of acts which depend upon territorial rights, such as the regulation of fisheries, or the placing of structures upon the bed of the stream, or permitting obstruction of navigation on its own part of the stream, which acts cannot be interfered with by the owner of the opposite shore. It cannot, however, forbid fishing in the opposite half of the stream, or the placing of obstructions there, when those acts are authorized by the laws of the owner of that side of the stream.

In Wedding v. Meyler, 192 U. S. 573, 66 L. R. A. 833, the question involved was whether Indiana's concurrent jurisdiction authorized an Indiana sheriff to serve a summons upon a defendant while he was on a boat anchored in the Ohio river below low water mark. It was held that the sheriff did have the right, since one of the

rights of concurrent jurisdiction was to administer the law of Indiana on the Ohio river below the low water mark, and that Indiana's concurrent jurisdiction was not restricted to legislative acts.

In speaking of the "concurrent jurisdiction" given to Indiana over the Ohio river by the Virginia Compact, the Supreme Court of the United States, in Wedding v. Meyler, *supra,* said:

"The question that remains, then, is the construction of the Virginia compact. It was suggested by one of the judges below that the words 'the respective jurisdiction . . . . shall be concurrent only with the states which may possess the opposite shore' did not import a future grant, but only a restriction; that they excluded the United States or other states, but left the jurisdiction of the states on the two sides to be determined by boundary, and therefore that the jurisdiction of Kentucky was exclusive up to its boundary line of low water mark on the Indiana side. This interpretation seems to be without sufficient warrant to require discussion. A different one has been assumed hitherto, and is required by an accurate reading. The several jurisdictions of two states respectively over adjoining portions of a river separated by a boundary line are no more concurrent than is a similar jurisdiction over adjoining counties or strips of land. Concurrent jurisdiction, properly so called, on rivers, is familiar to our legislation, and means the jurisdiction of two powers over one and the same place. There is no reason to give an unusual meaning to the phrase. See Sanders v. St. Louis & N. O. Anchor Line, 97 Mo. 26, 30, 3 L. R. A. 390, 10 S. W. 595; Opsahl v. Judd, 30 Minn. 126, 129, 130, 14 N. W. 575; J. S. Keator Lumber Co. v. St. Croix Boom Corp., 72 Wis. 62, 7 Am. St. Rep. 837, 38 N. W. 529, and the cases last cited.

"The construction adopted by the majority of the court of appeals seems to us at least equally untenable. It was held that the words 'meant only that the states should have legislative jurisdiction.' But jurisdiction, whatever else or more it may mean, is *jurisdictio,* in its popular sense of authority to apply the law to the acts of men. Vicat, Vocab. *sub. v.* See Rhode Island v. Massachusetts, 12 Pet. 657, 718, 9 L. ed. 1233, 1258. What the Virginia compact most certainly conferred on the states north of the Ohio was the right to administer the law below low water mark on the river, and, as part

of that right, the right to serve process there with effect. State v. Mullen, 35 Iowa, 199, 205, 206. What more jurisdiction, as used in the statute, may embrace, or what law or laws properly would determine the civil or criminal effects of acts done upon the river, we have no occasion to decide in this case. . . . .

"To avoid misunderstanding it may be well to add that the concurrent jurisdiction is jurisdiction 'on' the river, and does not extend to permanent structures attached to the river bed and within the boundary of one of the other states. Therefore, such cases as Mississippi & M. R. R. v. Ward, 2 Black 485, do not apply. State v. Mullen, 35 Ia. 199, 206, 207."

A good illustration of the enforcement by a state of its own penal laws upon a boundary stream is afforded by Dugan v. State, 125 Ind. 130, 9 L. R. A. 321.

In that case, a steamboat having its home port in Kentucky was engaged in running Sunday excursions on the Ohio river between Jeffersonville and Fern Grove, points in Indiana, in violation of the Indiana Sunday law. The Indiana statute was violated by acts upon its bordering river, having their beginning and ending on land within the borders of the state. It was held that the Indiana court had jurisdiction of a prosecution against the pilot of the boat, and the mere fact that the boat and its officers were non-residents, was immaterial.

In McFall v. Commonwealth, 2 Met. 394, McFall, a Cincinnati justice of the peace, was indicted and convicted for unlawfully solemnizing a marriage while on a ferryboat midway on the Ohio river between Newport, Ky., and Cincinnati, Ohio. The conviction was upheld, upon the ground that the offense was committed within the boundary of the State of Kentucky, the court citing Handly v. Anthony, *supra,* and Fleming v. Kenney, *supra.*

This view is expressed in Nielsen v. Oregon, 212 U. S. 315. In that case Nielsen was operating a purse net in the Columbia river, which was the boundary line between Oregon and Washington, but at a point in the river which was north of the middle channel thereof, and consequently within the territorial limits of the State of Washington. Fishing with a purse net was prohibited by the laws of Oregon, but was permitted by the laws of Washington; indeed, Nielsen had a license to so fish, issued by the State of Washington. The State of Oregon indicted Nielsen, who was convicted, and the conviction was sus-

tained by the Supreme Court of Oregon. 51 Oregon 588, 131 Am. St. Rep. 765, 16 Ann. Cas. 1113. But, upon appeal to the Supreme Court of the United States, that court said:

"The present case is not one of the prosecution for an offense *malum in se,* but for one simply *malum prohibitum.* Doubtless the same rule would apply if the act were prohibited by each state separately; but where, as here, the act is prohibited by one state and in terms authorized by the other, can the one state which prohibits prosecute and punish for the act done within the territorial limits of the other? Obviously, the grant of concurrent jurisdiction may bring up, from time to time, many and some curious and difficult questions, so we promptly confine ourselves to the precise question presented. The plaintiff in error was within the limits of the State of Washington, doing an act which that state in terms authorized and gave him a license to do. Can the State of Oregon, by virtue of its concurrent jurisdiction, disregard that authority, practically override the legislation of Washington, and punish a man for doing within the territorial limits of Washington an act which that state had specially authorized him to do? We are of opinion that it cannot. It is not at all impossible that, in some instances, the interests of the two states may be different. Certainly, as appears in the present case, the opinion of the legislatures of the two states is different, and the one state cannot enforce its opinion against that of the other; at least, as to an act done within the limits of that other state. Whether, if the act of the plaintiff in error had been done within the territorial limits of the State of Oregon, it would make any difference, we need not determine; nor whether, in the absence of any legislation by the State of Washington authorizing the act, Oregon could enforce its statute against the act done anywhere upon the waters of the Columbia. Neither is it necessary to consider whether the prosecution should be in the names of the two states jointly. It is enough to decide, as we do, that, for an act done within the territorial limits of the State of Washington, under authority and license from that state, one cannot be prosecuted and punished by the State of Oregon."

In closing its opinion last quoted from, the court referred to *In Re* Mattson, *supra,* and *Ex Parte* Desjeiro, *supra,* relied upon by appellant, but without approving

them. The opinion in Nielsen v. Oregon substantially overrules *In Re* Mattson and *Ex Parte* Desjeiro, since it holds, in effect, that a state can enforce its own criminal laws within its boundary, and declined to adopt the definition of "concurrent jurisdiction" given in those cases, although it was urged upon the court.

This authority from the highest tribunal that can pass upon the question would seem to end the discussion and require an affirmance of this case, since, under it, the Kentucky court had jurisdiction to punish a citizen of Kentucky for an infraction of its laws within its boundary. Whether Indiana courts have a similar power, and if so, what is the extent of that power, are immaterial questions, in this proceeding.

This view is in accord with the decisions of those state courts which have passed upon the question.

In J. S. Keator Lumber Co. v. St. Croix Boom Co., 76 Wis. 62, 7 Am. St. Rep. 837, the defendant obstructed the St. Croix river, which constituted the boundary line between Wisconsin and Minnesota, by maintaining a boom and other obstructions thereon; whereupon the plaintiff sued for damages. The defendant was authorized by its Minnesota charter to construct its booms upon the St. Croix river, and the boundary line between the two states where the boom was constructed was the main channel of the St. Croix. The authority of Minnesota alone to grant such a charter was conceded, unless she was deprived of that right by that clause contained in her constitution, as well as in the Wisconsin constitution, which secured to each state "concurrent jurisdiction" on that river. It became necessary, therefore, to define the phrase "concurrent jurisdiction," and, in doing so, the Supreme Court of Wisconsin said:

"Are the words 'concurrent jurisdiction,' as thus used, to be construed as requiring the joint action of both states to give validity to such a charter, or could Minnesota do so alone, with the corresponding right in Wisconsin to grant a similar charter? If such joint action was necessary to give such validity, then the refusal or mere failure of the one state to so act would wholly prevent the exercise of any jurisdiction by either state. 'Concurrent jurisdiction' are words usually applied to two or more courts. When so applied, no one has ever pretended that the exercise of such jurisdiction by the one court was dependent upon its concurrent exercise by any

other court.  On the contrary, all recognize the authority of each such tribunal to deal with the same subject-matter, at the choice of the suitor.  This is illustrated by the jurisdiction of state and federal courts in the same territory, as to controversies between citizens of different states and also as to other matters.  They never concur in each other's actions, but each proceeds separately and independently of the other.  The same is true respecting offenses and torts committed upon a river dividing two states, where the courts of each have jurisdiction of the same; for in such case each court must necessarily act separately and independently of the other. . . . .

"The words 'concurrent jurisdiction' must have been used, in the compact between the federal government, Wisconsin, and Minnesota, in the sense in which they had previously been used and were generally understood. When, therefore, by such compact it was in effect provided that each such state shall have 'concurrent jurisdiction' on that portion of the River St. Croix constituting the boundary line between them, it included the exercise of such legislative powers by each state over the whole river as were consistent with the exercise of similar powers over the same portions of the river by the other state.  In other words, by such compact each state secured to itself such 'concurrent jurisdiction' upon the half of the river within the territorial limits of the other state, by reducing what would otherwise have been its exclusive jurisdiction upon its own half to mere 'concurrent jurisdiction.'  The result is, that neither of these states could, as against the other, rightfully assume, or authorize the assumption of, permanent and exclusive occupancy, possession, and control of the entire navigable portions of the river.  President, etc. v. Trenton City Bridge Co., 13 N. J. Eq. 46; Attorney-General v. D. & B. B. R. R. Co., 27 Id. 631.  Of course, no two structures or bodies can occupy precisely the same space at the same time upon a river, any more than elsewhere.  Nevertheless, either state may, in aid of navigation, assume, or authorize the assumption of, reasonable occupancy, possession, and control of portions of such navigable waters, provided the same is reasonably consistent with similar occupancy, possession, and control which may be assumed or authorized by such other state.  Concurrent jurisdiction, to be of value to the respective states or to any one, must have a practical application.

Such application should, moreover, be consistent with the reasonable continuance of a navigable channel as a public highway between such states, and must necessarily remain subject to any regulation of commerce by Congress under the commercial clause of the federal constitution."

State v. Cunningham, 102 Miss. 237, Ann. Cas. 1914 D 182, decided in 1912, contains, perhaps, the ablest discussion of this question of concurrent jurisdiction, that is to be found in the books.

While conducting a bar-room on a ferry boat plying between Helena, Ark., and Trotters Point, Mississippi, on the opposite shore of the Mississippi river, and while in that part of the river which was west of the center or thread of the river, Cunningham sold intoxicating liquors in violation of the laws of Mississippi. He was indicted, tried and acquitted.

Pursuant to authority granted by Congress to fix their boundary line, and the criminal jurisdiction of the states of Mississippi and Arkansas, the jurisdiction of Mississippi was extended to the west bank of the river, and the jurisdiction of Arkansas was extended to the east bank, each state to have concurrent criminal jurisdiction over the river, whether the offense be committed on the Mississippi or Arkansas side.

In reversing the judgment of acquittal, the court, speaking through Chief Justice Mayes, said:

"Under the resolution of Congress and under the compact between the states of Mississippi and Arkansas, the fullest jurisdiction is granted to each state to exercise criminal jurisdiction over the waters of the Mississippi river; each state making and executing its own laws. This criminal jurisdiction extends to all kinds of crimes, both *malum in se* and *malum prohibitum.* Each state has a right to determine for itself what it shall constitute as a crime within its jurisdiction, and if these things are done on the waters of the river, it may punish in its own courts for the doing of the things, on the waters of the river, which are denounced by its laws, whether the other state has the same law or not. The jurisdiction given to the states enables them to legislate as to what shall constitute a crime in its jurisdiction, as well as to conduct prosecutions in its courts for crimes which were such at the date of the compact between the states.

"On the other hand, neither state can conduct a prosecution against any person for the doing of a thing upon the waters of the river which constitutes a crime only under the laws of the other state. Each state must conduct its prosecutions for such crimes as are denounced by its own laws, and, in case the act is a crime in both states, then the state first acquiring jurisdiction shall conduct the prosecution to its final determination, and when the prosecution is so conducted it is a bar to any further proceedings in the courts of the other state, even though the punishment may be different in each state. Concurrent jurisdiction of this character cannot be given to sovereign states without its perplexities and confusion, but we think the authorities are all in accord with the rule of law as we now announce it."

Lemore v. Commonwealth, 127 Ky. 480, is to the same effect.

State v. Moyers, 155 Iowa 678, 41 L. R. A. (N. S.) 366, is directly in point. In that case, Moyers was prosecuted, in an Iowa court, for fishing with a hoop net in the Mississippi river, which formed the boundary line between Iowa and Illinois, without having obtained the license required by the laws of Iowa. Under the Acts of Congress of 1818 and 1845 admitting Illinois and Iowa, respectively, into the Union, those states "have concurrent jurisdiction on the river Mississippi," the middle thread of the river, however, being the boundary line between the two states.

Moyers was acquitted in the district court, under a direction from the court, because it did not appear that he was fishing on the westerly or Iowa side of the river.

In holding that ruling to be erroneous, the court said:

"An examination of the various cases relating to the subject of concurrent jurisdiction over boundary rivers develops the fact that great difficulty has been experienced in determining its nature and scope. We think that the meaning of the term as used in the acts of Congress conferring such concurrent jurisdiction upon the various states may be ascertained with some reasonable accuracy by taking into account the difficulties evidently intended to be avoided.

"As suggested by this court in State v. Mullen, *supra,* a manifest purpose was to avoid the question so difficult of determination, as to whether a criminal act was com-

mitted on one side or the other of the imaginary boundary line, which might often be a matter of uncertainty. To the same effect, see State v. George, 60 Minn. 503, 63 N. W. 100. This evident purpose of Congress is not accomplished if in any kind of a judicial proceeding the jurisdiction of the court over the subject-matter is dependent upon the relation of the transaction as to the place of its occurrence to the exact boundary line of the state. Nor will such purpose be accomplished if it is held that the laws of the state are of no force or effect beyond this boundary line; for the courts of the state would in that event be called upon to determine in each case involving the application of its laws to a transaction on the river, whether the transaction were on the one side or the other of this boundary line.

"The whole question seems to turn ultimately on the meaning to be given to the phrase 'concurrent jurisdiction.' If the purpose of Congress was to give to each of the states bordering on the river no other power than to enforce its laws with reference to transactions on that part of the river included within its boundary line, then no purpose whatever was served beyond that which would have been accomplished by fixing the boundary line itself, for complete jurisdiction up to that boundary line would thereby have been vested in the adjoining states. Certainly something more was intended, and the thing evidently intended was that all the jurisdiction which might otherwise have been exercised by the state with reference to transactions on the river within the boundary line should be possessed and exercised by the state with reference to like transactions on any part of the river without regard to the boundary. This conclusion is in accordance with the great preponderance of authority in relation to similar questions. J. S. Keator Lumber Co. v. St. Croix Boom. Corp., 72 Wis. 62, 7 Am. St. Rep. 837, 38 N. W. 529; Opsahl v. Judd, 30 Min. 126, 14 N. W. 575; Carlisle v. State, 32 Ind. 55; Sherlock v. Alling, 44 Ind. 184; Memphis & C. Packet Co. v. Pikey, 142 Ind. 304, 40 N. E. 527; Dugan v. State, 125 Ind. 130, 9 L. R. A. 321, 25 N. E. 171; Welsh v. State, 126 Ind. 71, 9 L. R. A. 664, 25 N. E. 883; State v. Metcalfe, 65 Mo. App. 681; Wiggins Ferry Co. v. Reddig, 24 Ill. App. 260; Harrell v. Speed, 113 Tenn. 224, 1 L. R. A. (N. S.) 639, 106 Am. St. Rep. 814, 81 S. W. 840, 3 Ann. Cas. 260; State v. Faudre, 54 W. Va.

122, 63 L. R. A. 877, 102 Am. St. Rep. 927, 46 S. E. 269, 1 Ann Cas. 104; McFall v. Com., 2 Met. (Ky.) 394. The use of the term is not to be construed as requiring joint action of the two states. J. B. Keator Lumber Co. v. St. Croix Boom Corp., *supra.* Manifestly this is so, for joint action in the exercise of jurisdiction over the river would be impracticable. Neither the legislatures nor the courts of the two states could make a joint arrangement by which the laws of the one should not be operative on the river, unless they coincided in every way with the laws of the other. No state of the Union can, without the consent of Congress, enter into any agreement or compact with another state. U. S. Const., art. 1, sec. 10., par. 3. In effect, the states are by this provision of the Constitution incapable of entering into treaties with each other.''

In some of the cases it is held that ''concurrent jurisdiction'' does not include the power to regulate the right to fish in boundary waters.

Thus, in Roberts v. Fullerton, 117 Wis. 222, 65 L. R. A. 953, it appeared that the federal statute gave Minnesota and Wisconsin concurrent jurisdiction on the waters of the Mississippi river, and the plaintiff sued the defendant for damages for taking the plaintiff's fish net from where it was located by him to catch fish in the waters of Lake Pepin, the net being staked to the bottom of the lake. Defendant answered, admitting the allegations of the complaint, and pleading, in justification, that he acted as an officer of the State of Minnesota. A demurrer was sustained to the answer, whereupon the defendant appealed.

In affirming the decision of the lower court, the Wisconsin Supreme Court said.

''Without proceeding further in our investigations, we are satisfied that the term 'concurrent jurisdiction' was used in the acts admitting, or providing for the admission of, Wisconsin and Minnesota into the Union in the same sense in which it had theretofore been used as applicable to similar situations, both in written and unwritten laws—in the same sense that it is said concurrent jurisdiction exists by comity of nations upon waters divided by their boundary line, unless otherwise provided by some written law.

''Tested by the principle above adopted, do the mere police regulations of one country regarding the exercise

of the common right of fishing extend into the territory of a foreign jurisdiction, the two being separated by an imperceptible boundary line in a river or lake? Is the common right of fishing which belongs to the people of this state within all that part of its territory on the easternly side of the main channel of the Mississippi river subject to the laws of the state of Minnesota? There is no escaping the conclusion that, if such is the case, it is competent for that state to extend its police regulations as regards fishing and hunting over a large part of the waters of Lake Superior on the Wisconsin side, reaching up to the shore line, and for the state of Michigan to extend its laws on Lake Michigan on the same subject to the Wisconsin shore. We have searched in vain to find authority to sustain the affirmance of the proposition suggested. In no instance recorded in the books has one country been held entitled to exercise jurisdiction to regulate the common right of fishing in the territory of a foreign state under the measure of concurrent jurisdiction commonly exercised by the two on the waters divided by their boundary line. We venture to say that such concurrent jurisdiction has never been successfully invoked to justify interference by one state or country with the enjoyment of the right to fish within the territorial boundaries of the other. It would be foreign to the necessities of this case to enter into a discussion regarding the limits of that jurisdiction. It is sufficient for this case that we have reached the conclusion that, while it refers to acts of a criminal or civil nature on the water, or acts in some way connected with the use of the water for navigable purposes, it does not extend to the right of one state by legislative enactment to govern the fishery rights of the people in a foreign jurisdiction. As we have before seen, this country and the British provinces exercise concurrent jurisdiction over the waters divided by their boundary line, and the same is true as to this country and Mexico. No one would venture to say that one country could enforce its laws for the preservation of fish or regulating the taking of fish within the territorial limits of the other. It is to be regretted that the nature of the authority on waters of the Mississippi, exercisable by Wisconsin and Minnesota, has not been heretofore definitely decided. No court has yet dealt with the subject, or the meaning of the language requiring construction in similar situa-

tions, so as to cover the whole thereof satisfactorily, if at all. Many judges have deplored the uncertainty existing, but have found a convenient way of escaping the labor of removing it. The interests at stake are so great that it is not to be wondered that anyone appreciating the same should hesitate long before entering upon the difficult task of solving completely the troublesome question suggested. There is a consensus of opinion that concurrent jurisdiction does not mean concurrent dominion, and that it refers only to things afloat or on the water in some reasonable view of the situation, or so circumstanced as to be legitimately regarded as connected with the use of the water for navigable purposes. That is about as far as the courts have gone. In Garner's Case, 3 Gratt. 655, 676—a case decided in a jurisdiction where, if anywhere, we would except the term under discussion to have had a well defined and well understood meaning at an early day—while the judges in lengthy opinions severally referred to it, not one of them attempted to define it. Judge Taliaferro said, it refers 'only to things afloat' at best. 'The question is a very important one, and I decline stating any opinion, when it does not necessarily arise in the case.' Justice Fry said (p. 752): 'What is the precise meaning of concurrent jurisdiction I am not prepared to say. It strikes me as equivalent to common.' It is our opinion that the term refers to that authority commonly exercised concurrently upon the water divided by the boundary line between two countries, according to the public law as recognized in this country at the time the use of the term became common in our legislative history; that it refers to matters at least in some way connected with the use of the water for navigable purposes, to things afloat, or in some legitimate sense on the water— things difficult to deal with if it were necessary to determine in each instance of the exercise of jurisdiction the precise location of the particular act involved as regards the boundary line; but that it does not include the right to regulate the enjoyment, by the people of one state within its domain, of rights incident to their situation, such as the right to navigate or fish. It does not empower one state to spread its mere police regulations over territory of another, regulating the sovereign property right of the latter in or to the water flowing over such territory, or to the fish therein or fowls

thereon, which it holds in trust for the enjoyment of the whole people within its boundaries, in their individual capacities, under such legal restraints as such other, in its legislative wisdom, may see fit to impose—so long as such enjoyment does not interfere, unlawfully, with like enjoyment by the people of the state on the opposite side of the boundary.''

State v. Bowen, 149 Wis. 203, 39 L. R. A. (N. S.) 200, is to the same effect, holding that the jurisdiction of a state for the enforcement of its fish and game laws is co-extensive with and limited by the boundaries of the states, even though they consist of the thread of a navi-gable stream over whose waters the adjacent states have concurrent jurisdiction for other purposes.

These decisions are rested upon the well established principle that by reason of the state's control over fish and game within its limits, it is within the police power of its legislature, subject to constitutional restrictions, to enact such general or special laws as may be reasonably necessary for the protection and regulation of the public's right in its fish and game, even to the extent of restricting the use of, or right of property, in the game after it has been taken or killed. 19 Cyc. 1006, 1008, 1012; Greer v. Connecticut, 161 U. S. 529; Wharton v. Wise, 153 U. S. 155; United States v. Alaska Packers' Association, 79 Fed. 152.

The Act of 1916, now under consideration, was passed by virtue of that power; and similar statutes have been enacted in most of the states. If it were necessary for Indiana to pass similar laws, or to consent to the statutes enacted by the legislature of Kentucky upon the subject, or *vice versa*, there would be no protection whatever for the fish in the Ohio river, since it is practically impossible to get the legislatures of different states to co-operate to that extent.

The concurrent jurisdiction of Indiana and Kentucky requires neither state to consent to the laws of the other, or to agree upon the enactment of statutes, in order to exercise their respective jurisdictions. Neither state has ever entertained so impracticable an idea. The cases showing that Kentucky has separately exercised her jurisdiction, have heretofore been cited. Indiana has repeatedly exercised her jurisdiction in precisely the same way. Carlisle v. State, 32 Ind. 55; Sherlock v. Alling, 44 Ind. 184; Dugan v. State, 125 Ind. 130, 9 L. R. A. 321;

Welsh v. State, 126 Ind. 71, 9 L. R. A. 664; M. & C. P. Co. v. Pikey, 142 Ind. 304.

Both states have proceeded upon the theory that concurrent jurisdiction means jurisdiction of two powers over one and the same place, as defined by the United States Supreme Court in Wedding v. Meyler, *supra;* each state making and executing its own laws, without considering whether the other state had the same laws.

To say that the jurisdiction is joint, thereby requiring the joint action of the two states, would not only deprive each state of the jurisdiction expressly conferred upon it by the compact with Virginia with the consent of Congress, but it would require the two states to make an agreement or compact by which the laws of one should not be operative on the river, unless they coincided in every way with the laws of the other—an arrangement expressly forbidden by section 10 of article 1 of the federal constitution. State v. Moyers, *supra.*

As stated by Rorer, this concurrent jurisdiction is given over the river and not of the laws of the abutting states. Rorer on Interstate Law, p. 438.

The adjudications of courts of last resort sustaining this view are quite numerous, as is above shown, while the theory that concurrent jurisdiction means "joint" jurisdiction has been countenanced only in *In re* Mattson (1895), *supra,* and *Ex Parte* Desjeiro (1907), *supra,* both decided in the U. S. circuit court for the district of Oregon. Neither of these cases has ever been approved or followed by any other court; and, in view of the later federal cases of Neilsen v. Oregon, *supra,* and Columbia River Packers' Assn. v. McGowan, 72 Fed. 991, they must be considered both as unsound in principle and against the great weight of authority.

So, whether we apply the rule that a state has jurisdiction of offenses committed within its boundary; or construe the concurrent jurisdiction of Kentucky to give it jurisdiction over the whole of the Ohio river regardless of the location of the boundary line between Kentucky and Indiana; or apply the doctrine that the State of Kentucky has the right to protect the fish within its limits, the judgment of the circuit court will have to be affirmed.

It is so ordered.