*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0285p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

WILLIAM SHEFFIELD,

              *Plaintiff-Appellant,*

        *v.*

CITY OF FORT THOMAS, KENTUCKY; MARY
BROWN, Mayor; BARBARA RUNGE, JAMES
DOEPKER, ROGER PETERMAN, BARBARA
THOMPSON-LEVINE, and TOM LAMPE,
Council Members; and ERIC HAAS, Mayor
Pro-Tem; in their individual and official
capacities,

              *Defendants-Appellees.*

No. 09-5619

> Appeal from the United States District Court
> for the Eastern District of Kentucky at Covington.
> No. 08-00054—Danny C. Reeves, District Judge.

Argued: June 15, 2010

Decided and Filed: September 3, 2010

Before: KEITH, BOGGS, and McKEAGUE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Robert E. Blau, BLAU & KRIEGE, PLLC, Cold Spring, Kentucky, for
Appellant. Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING,
P.L.L.C., Covington, Kentucky, for Appellees. **ON BRIEF:** Robert E. Blau, BLAU &
KRIEGE, PLLC, Cold Spring, Kentucky, for Appellant. Jeffrey C. Mando, ADAMS,
STEPNER, WOLTERMANN & DUSING, P.L.L.C., Covington, Kentucky, Stephen D.
Wolnitzek, WOLNITZEK & ROWEKAMP, P.S.C., Covington, Kentucky, for
Appellees.

1

---

**OPINION**

---

BOGGS, Circuit Judge.  Plaintiff William Sheffield challenges several municipal ordinances enacted by the city of Fort Thomas, Kentucky, alleging that the ordinances violate the United States and Kentucky Constitutions and that the ordinances are preempted by Kentucky state statutes and administrative regulations.  The district court rejected all of Sheffield's challenges.  With one exception, we agree with that conclusion.  We hold, however, that the district court erred in concluding that Kentucky administrative regulations have no preemptive force as against Kentucky municipal ordinances.  We therefore affirm in part and reverse in part.

## I.  BACKGROUND

Between 1950 and the present day, the deer population within the state of Kentucky increased approximately five-hundredfold.  According to the Kentucky Department of Fish and Wildlife Resources ("DFWR"), "deer are reaching a saturation point in many parts of the Commonwealth."  Among these regions is the heavily wooded area surrounding the city of Fort Thomas (a suburb of Cincinnati, Ohio), whose residents have suffered increasingly from motor vehicle collisions with deer, landscaping damage due to deer, and other cervid-perpetrated problems.  Eventually, the members of the Fort Thomas City Council decided to take action.

Beginning in October 2006, a city administrative officer worked with DFWR representatives to develop a deer-management plan.  Various options were considered, ranging from implementing a catch-and-release program to administering a birth-control drug derived from pig ovaries.  In the end, the City Council opted for a three-part approach: (1) educating the public about deer-control tactics; (2) prohibiting deer feeding; and (3) permitting the hunting of deer by bow and arrow within the city limits, which DFWR representatives had advised was the most effective means of controlling the deer population in an urban area.

The second and third parts of this plan required several additions and amendments to the Fort Thomas City Code (the "Ordinances"), which the City Council enacted in December 2007. To implement the deer-feeding ban, the City Council adopted an ordinance (the "Deer-Feeding Ordinance") which read in relevant part:

§ 91.50  DETERMINATION OF CITY.

It is hereby determined that an increasing population of deer within the city: poses a threat to public safety by increasing the likelihood of deer-vehicle collisions, deer attacks on residents, pedestrians and visitors, and the transmission of diseases to humans from deer; poses a threat to native plant and animal life by excessive foraging which disturbs natural ecological balances; and poses a threat to the quality of life by deer-related damage to landscaping and vegetable gardens.

§ 91.51  FEEDING PROHIBITED.

(A)  No person shall knowingly, purposely or intentionally feed deer, cause deer to be fed or provide food to deer in the city on any public or private property. This prohibition includes, but is not limited to, disbursement of food on the ground, at a feeding station, in a feeding device, or in a container of any form; providing a salt or mineral lick/block; or any other means which serves to provide feed to any deer in the city.

(B)  A person shall be deemed to have knowingly, purposely or intentionally fed deer, caused deer to be fed, or provided food to deer if the person places, or allows to be placed, wheat, pelleted livestock food, corn in any form, fruit, vegetables, hay or alfalfa, human food scraps, any form of commercially sold wildlife feed, birdseed or livestock feed, or any other edible matter that deer will consume on the ground or within the reach of deer. This prohibition shall not include live vegetation such as ornamental landscaping, flowers, trees, vines, vegetable gardens, edible matter located either in an enclosed building or stored in a securely sealed package, or unmodified commercially purchased bird feeders or their equivalent when placed out of the reach of deer.

Ft. Thomas, Ky. Ordinance O-34-2007 (Dec. 3, 2007) (codified at Ft. Thomas, Ky. Code §§ 91.50–52).

To implement the remainder of its plan, the City Council had to modify § 95.05 of the City Code, entitled "Discharge of Firearms and Other Weapons," which provided at the time that "[n]o person [other than a police officer] shall discharge any firearm of

any nature, nor use or discharge any sling, bow, or other weapon in the City of Fort Thomas . . . ."  To that end, the City Council enacted an ordinance (the "Bow-and-Arrow Ordinance") inserting the following language at the end of § 95.05:

> The provisions of this subchapter shall not apply to any individual discharging an arrow from a bow or crossbow when such discharge meets all of the following requirements:
>
> (1)  When such discharge occurs during the Kentucky archery hunting season for deer as established by the Commonwealth of Kentucky or when such discharge occurs pursuant to a depredation permit issued by the Kentucky Department of Fish and Wildlife Resources;[1] and
>
> (2)  When the individual is discharging an arrow from a point not less than 200 feet from a residence, apartment, or business structure not on the property on which the discharge is occurring, or a street, highway, interstate, railroad or park, in the intended direction of the arrow; and
>
> (3)  When the individual is discharging an arrow in a manner where no residence, apartment or business structure not on the property on which the discharge is occurring, or a street, highway, interstate, railroad or park is less than 50 feet perpendicular to the arrow's intended path of trajectory [sic]; and
>
> (4)  When the individual is discharging an arrow in a manner in which it does not leave the property from which it is being discharged; and
>
> (5)  When the individual is discharging an arrow not more than 35 yards from the intended target; and
>
> (6)  When the individual discharging an arrow is either the owner of the property upon which the arrow is being discharged or has the permission of the property owner upon which the arrow is being discharged.

Ft. Thomas, Ky. Ordinance O-35-2007 (Dec. 17, 2007) (codified at Ft. Thomas, Ky. Code § 95.05).

---

[1]This paragraph was amended in 2008 and again in 2009.  *See* Ft. Thomas, Ky. Ordinances O-08-2008 (June 16, 2008), O-18-2009 (Oct. 5, 2009).  It currently reads, "When such discharge occurs from one-half hour before sunrise to 10:00 AM from November 1 through November 21 or from January 1 through the end of the Kentucky archery hunting season for deer as established by the Commonwealth of Kentucky for that year or from one-half hour before sunrise to 10:00 AM when such discharge occurs pursuant to a depredation permit issued by the Kentucky Department of Fish and Wildlife Resources . . . ."

Finally, to address the disposal of the carcasses of the deer (and other animals) that could now be shot by bow and arrow within the city limits, the City Council enacted another provision (the "Field-Dressing Ordinance"):

§ 95.30  SCOPE.

This subchapter shall apply to the field dressing of any animal killed in conjunction with the discharge of any arrow from a bow in strict compliance with § 95.05 of this chapter [i.e., the Bow-and-Arrow Ordinance].

§ 95.31  DEFINITIONS.

FIELD DRESSING.  The process of removing blood and internal organs from an animal carcass.

§ 95.32  REQUIREMENTS.

Any individual who field dresses an animal carcass within the City of Fort Thomas is required to containerize and remove all blood and internal organs from within the City of Fort Thomas. No blood or internal organs resulting from field dressing an animal shall be buried, burned, or otherwise disposed of within the City of Fort Thomas, nor shall any blood or internal organs be placed in trash containers for collection by the city or the city's garbage franchisee.

Ft. Thomas, Ky. Ordinance O-35-2007 (Dec. 17, 2007) (codified at Ft. Thomas, Ky. Code §§ 95.30–32).

In December 2007, Fort Thomas residents Lisa Kelly and William Sheffield filed suit in Kentucky state court against the city, as well as various city officials in their individual and official capacities, alleging that the Ordinances violated various provisions of the United States and Kentucky Constitutions and were preempted by Kentucky state statutes and administrative regulations.  The defendants removed the complaint to federal court.  In two separate orders dated January 8, 2009 and April 23, 2009, the district court granted the defendants summary judgment as to all claims.  *See Kelly v. City of Fort Thomas, Ky.*, 610 F. Supp. 2d 759 (E.D. Ky. 2009).

Plaintiffs timely appealed; Kelly, however, withdrew from the lawsuit after she was elected to the very City Council whose membership she was suing.  Sheffield, now

the sole appellant, has abandoned many of the claims asserted before the district court. His remaining claims are: (1) that all three Ordinances are preempted by Chapter 150 of the Kentucky Revised Statutes, which broadly regulates the Commonwealth's wildlife resources, and/or by Chapter 301 of the Kentucky Administrative Regulations, which more concretely regulates hunting; (2) that the Bow-and-Arrow Ordinance violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution and § 2 of the Kentucky Constitution because it infringes on his asserted "fundamental right to be free from a risk of serious bodily harm" and/or lacks a rational basis; and (3) that the Deer-Feeding Ordinance violates those same constitutional provisions because it is void for vagueness.[2]

## II.  STANDARD OF REVIEW

We review de novo a district court's order granting summary judgment. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009).  Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). In reviewing the district court's decision, we view all evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[2]Sheffield also argues that the district court erroneously held the City officials protected from individual liability by the doctrine of official immunity.  As a threshold matter, it is unclear what actual damages Sheffield is seeking from the individual defendants beyond invalidation of the Ordinances.  In any event, the district court properly concluded that the individual defendants enjoy immunity under both federal and state law.  *See Bogan v. Scott-Harris*, 523 U.S. 44, 53 (1998) (local officials categorically immune from individual federal liability for legislative acts); *Godman v. City of Fort Wright*, 324 S.W.3d 362, 370 (Ky. Ct. App. 2007) (local officials immune from individual state-law liability unless bad faith is demonstrated) (citing *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001)).

## III. DISCUSSION

### A. State-Law Preemption

#### 1. *Relevant State-Law Provisions Governing Wildlife*

Sheffield argues that the Ordinances are preempted by Chapter 150 of the Kentucky Revised Statutes (1952 Ky. Acts, Ch. 200, § 2), which contains numerous provisions regulating fish and wildlife resources, and/or by administrative regulations promulgated thereunder by the DFWR. *See* Ky. Rev. Stat §§ 150.010–150.999; 301 Ky. Admin. Regs. 1:010–6:070.  A brief summary of the relevant provisions is in order.

> The declared purpose of Chapter 150 is
>
> to protect and conserve the wildlife of this Commonwealth so as to insure a permanent and continued supply of the wildlife resources of this state for the purpose of furnishing sport and recreation for the present and for the future residents of this state; to promote the general welfare of the Commonwealth; to provide for the prudent taking and disposition of wildlife within reasonable limits, based upon the adequacy of the supply thereof; to protect the food supply of this state, and to insure the continuation of an important part of the commerce of this state which depends upon the existence of its wildlife resources.

Ky. Rev. Stat. § 150.015(1).  Among many other things, that chapter establishes  the DFWR in order to "enforce the laws and regulations adopted under this chapter relating to wildlife," *id.* § 150.021; empowers the DFWR to issue regulations regarding hunting season dates, bag limits, weapons usable for hunting, and locations where hunting is permitted, *id.* § 150.025; implements a regime governing hunting licenses, *id.* §§ 150.170–236; and prohibits the "discharge of any firearm, bow and arrow, crossbow or other similar device, upon, over, or across any public roadway" anywhere in the state, *id.* § 150.360(4).  Chapter 150 does not address whether hunting is permitted or prohibited in urban areas (or whether cities have any say in the matter).  Nor does it address the proper method of disposal of animal carcasses, other than to state that (1) landowners without hunting licenses who kill wild animals causing damage to their property must obtain the DFWR's authorization if they wish to "use the carcass," *id.*

§ 150.170(7); and (2) licensed hunters may place animal carcasses in cold storage or mount them, *id.* §§ 150.305(2), 150.411(2).

The DFWR, in turn, has promulgated a variety of regulations associated with wildlife.  One relevant provision, among other things, (1) specifies various windows of time between September and January when deer may be hunted with various weapons; and (2) divides Kentucky's counties into four "zones" and specifies how many deer a person may "take" per year in each zone.  301 Ky. Admin. Regs. 2:172.  This regulation does not address where deer hunting is permitted or prohibited within each zone (e.g., in urban areas).  Another relevant regulation prohibits the feeding of wildlife from March 1 through May 23, but provides that "[w]ildlife may be fed year round within the curtilage of the home."  301 Ky. Admin. Regs. 2:015 § 2(2).  Lastly, a regulation provides that killed deer must be logged "before moving the carcass from the site where taken," *id.* 2:172 § 9(1), and that a carcass must be tagged if it "leaves the possession of [the] hunter," *id.* § 10(2), but does not otherwise address the disposal of carcasses.

**2.  *Kentucky's Home Rule Statute***

The obvious jumping-off point for our preemption analysis is Ky. Rev. Stat. § 82.082, known as the "Home Rule Statute."  Under that statute, "[a] city may exercise any power and perform any function within its boundaries . . . that is in furtherance of a public purpose of the city *and not in conflict with a constitutional provision or statute*." Ky. Rev. Stat. § 82.082(1) (emphasis added). The Home Rule Statute further provides that "[a] power or function is in conflict with a statute if it is expressly prohibited by a statute or there is a comprehensive scheme of legislation on the same general subject embodied in the Kentucky Revised Statutes . . . ."  *Id.* § 82.082(2).

Where a municipal ordinance conflicts with a constitutional provision or statute, the ordinance "is preempt[ed]," *Lexington Fayette County Food & Beverage Ass'n v. Lexington-Fayette Urban County Gov't*, 131 S.W.3d 745, 750 (Ky. 2004); in other words, the municipality is "without authority" to enact that ordinance, and the ordinance

must be struck down as "invalid[]." *Ky. Licensed Beverage Ass'n v. Louisville-Jefferson County Metro Gov't*, 127 S.W.3d 647, 649 (Ky. 2004).[3]

### 3. *Preemption Analysis of the Ordinances*

### a. **Bow-and-Arrow Ordinance**

Sheffield first argues that the Bow-and-Arrow Ordinance is preempted because it allows the crossbow hunting of deer during windows of time when 301 Ky. Admin. Regs. 2:172 § 5 (entitled "Statewide Season Dates") forbids it. We set aside for the moment the issue of whether administrative regulations have preemptive force vis-à-vis municipal ordinances, as we conclude that Sheffield is simply mistaken with respect to what the Ordinance purports to authorize.

To wit, the Bow-and-Arrow Ordinance does not affirmatively provide that *deer may be hunted* within city limits during the time periods specified therein; rather, it merely provides that *arrows may be discharged from bows and crossbows* within city limits during those times. The Ordinance's text is entirely agnostic as to the purpose behind the discharge: it might be for the purpose of hunting deer, state laws and regulations permitting, but it might also be for target practice or any number of other reasons. The DFWR regulation to which Sheffield points does not prohibit the discharge of arrows from crossbows *per se* at any time. Because the Ordinance does not purport to "permit[] conduct which is prohibited by [the regulation]," there is no explicit conflict between them. *Louisville & Nashville R.R. Co. v. Commonwealth ex rel. City of Covington*, 488 S.W.2d 329, 330 (Ky. 1972).

---

[3]Occasionally, the Kentucky courts have reserved the term "preemption" for scenarios where a "comprehensive scheme of legislation" exists on the same subject as a municipal ordinance, and applied the term "conflict" to scenarios where the incompatibility between a municipal ordinance and a state law is explicit. *See, e.g.*, *Commonwealth v. Do, Inc.*, 674 S.W.2d 519, 522 (Ky. 1984) ("The doctrine of preemption is often confused with the doctrine that provides that there should be no conflict between state and local regulation."). However, in other opinions, the Kentucky courts have viewed both of these as variants of a single doctrine of preemption. *See, e.g.*, *Lexington Fayette County Food & Beverage Ass'n*, 131 S.W.2d at 750–51. Federal law views both of these as variants of "preemption." *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). For simplicity's sake, we do the same, since the nomenclature does not affect our analysis.

Sheffield also argues that the Bow-and-Arrow Ordinance is preempted because it purports to regulate hunting, notwithstanding the fact that "[t]he State has already exercised its supreme power regarding hunting by enacting a [comprehensive] scheme of legislation" at Chapter 150 of the Kentucky Revised Statutes. Appellant's Reply Br. at 6. The Kentucky courts have never addressed whether Chapter 150 is a "comprehensive scheme of legislation" or how broad its preemptive effect might be. However, our analysis of the Kentucky case law satisfies us that the Kentucky courts would not hold the Bow-and-Arrow Ordinance preempted by Chapter 150 as a whole.[4]

The leading Kentucky case on "comprehensive scheme" preemption is *Commonwealth v. Do, Inc.*, in which the question presented to the Kentucky Supreme Court was "whether the entry of the State into the field of lead-poisoning prevention . . . preempts local regulations and enforcement." 674 S.W.2d 519, 520 (Ky. 1984). The court stated that the "test for preemption" of an entire field of regulation is whether:

> (1) The subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.

*Id.* at 521 (quoting *In re Hubbard*, 396 P.2d 809, 815 (Cal. 1964)). The court noted that "that there are many individual situations where local police power may operate on the same subject matter to supplement the general law by providing for additional reasonable requirements." *Id.* at 521–22. The fundamental question, the court observed, is whether "the General Assembly *intend[ed]* to exclusively occupy th[e] area of regulations." *Id.* at 521 (emphasis added); *see also Wright v. Gen. Elec. Co.*, 242

---

[4] In fact, it appears that the only cases since the enactment of the Home Rule Statute in which municipal ordinances were held preempted by a "comprehensive scheme of legislation" have involved the exhaustively state-regulated field of alcoholic beverage sales. *See Ky. Licensed Beverage Ass'n*, 127 S.W.3d at 648–49; *Whitehead v. Estate of Bravard,* 719 S.W.2d 720, 721 (Ky. 1986).

S.W.3d 674, 678 (Ky. Ct. App. 2007) ("[Legislative] intent is the touchstone of all preemption analysis." (quoting *Keck v. Commonwealth ex rel. Golden*, 998 S.W.2d 13, 15 n.4 (Ky. Ct. App. 1999)).

Defendants argue that even if Chapter 150 comprehensively regulates the treatment of the Commonwealth's wildlife resources, including the hunting thereof, the Bow-and-Arrow Ordinance is not preempted because it is not a "hunting ordinance" in the first place. After all, under the Home Rule Statute, "comprehensive scheme" preemption only exists where "there is a comprehensive scheme of legislation *on the same general subject*" as the challenged ordinance. Ky. Rev. Stat. § 82.082(2) (emphasis added). Indeed, as we have already noted, the Ordinance on its face regulates only when bows and arrows may be fired within city limits. This certainly weighs against a finding of preemption.

Further, given the historical background against which Chapter 150 was enacted, we cannot conclude that the General Assembly intended to preclude municipalities from regulating when weapons may be fired within their borders. *See Do*, 674 S.W.2d at 521 (observing that preemption turns on "the General Assembly['s] inten[t]"). Kentucky's high court noted over seventy years ago — well before Chapter 150 was enacted — that "[p]ractically all cities and towns have ordinances making it unlawful to discharge firearms therein . . . ." *Lexington Ry. Sys. v. True*, 124 S.W.2d 467, 469 (Ky. 1939). And almost twenty years before that, the same court noted that "for at least the half of a century, [i.e., since 1870,] the Legislature has shown a consistent purpose and intention" that "the governing authorities of . . . municipalities [have] the right to make the discharge of firearms within their limits lawful [or unlawful] within certain limits, or at certain places or on certain occasions, thus bestowing upon such authorities *a discretion as to the times and the places where firearms may be discharged*." *Commonwealth v. Vanmeter*, 221 S.W. 211, 213 (Ky. 1920) (emphasis added) (affirming

conviction under ordinance stating that "[n]o person . . . shall shoot off a gun, pistol, sling, air gun or flobert rifle, within the city limits of Mt. Sterling").**5**

It is unlikely that when the General Assembly enacted Chapter 150, it intended to upend this long-standing tradition *sub silentio* and arrogate the topic of intra-city weapon discharge to its exclusive control. *See Valley Vista Servs., Inc. v. City of Monterey Park*, 13 Cal. Rptr. 3d 433, 438 (Cal. Ct. App. 2004) (stating that where "local [governments] through their traditional police power have [historically] played the dominant role in [a] matter[]," it is less likely that the legislature intended to "impliedly preempt the field").

In fact, at oral argument, Sheffield's counsel *conceded* Fort Thomas's authority to impose an absolute ban on discharging any weapons within city limits at any time, as it had formerly done. Given this concession, Sheffield cannot seriously dispute that the City Council had the power to ban discharging *less than all* weapons at *less than all* times, as the greater power typically includes the lesser. Sheffield's actual complaint thus does not appear to be that the enacted text is an inherently improper exercise of municipal authority, but rather, that the City Council's *motive* in enacting it — the hope that hunters would take advantage of it to kill deer in accordance with state law — renders improper an action the City Council would otherwise have been empowered to take.

However, neither the Home Rule Statute's text nor any Kentucky case appears to support such a proposition. Indeed, in the constitutional-law context, "[c]ourt[s] will not strike down an otherwise constitutional [enactment] on the basis of an alleged illicit motive." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (O'Connor, J., for a four-Justice plurality) (upholding municipal ordinance against First Amendment challenge and rejecting argument that "that the city council . . . had an illicit motive in enacting the ordinance"). We therefore hold that the Bow-and-Arrow Ordinance is not preempted.

---

**5**It thus appears that the tradition of municipal regulation of weapon use (with the blessing of the state legislature) predates not just Chapter 150, but also the very first rudimentary Kentucky game-hunting laws. *See* Kentucky Department of Fish & Wildlife Resources, *Kentucky's Deer Restoration*, Ex. A to Def'ts' Mot. for Summ. J. at 2, 4 (describing Kentucky's "first restrictions on hunting [adopted] in 1894").

**b.  Field-Dressing Ordinance**

Sheffield raises a similar "comprehensive scheme" preemption argument against the Field-Dressing Ordinance, which requires anyone who "field dresses" (i.e., "remov[es] blood and internal organs from [the] carcass" of) any "animal killed in conjunction with [the Bow-and-Arrow Ordinance]" to "containerize and remove all blood and internal organs from within the City," and which prohibits the "bur[ial], burn[ing], or other[] dispos[al]" of such blood and organs within the City.  Sheffield argues that this provision's subject matter places it squarely within the ostensibly state-preempted field of hunting.  We are not convinced.

First, we note that while "field dressing" is certainly a concept *associated* with the hunt, it is not technically a *part* of "hunting" proper — i.e., "[t]he action or practice of chasing game or other wild animals, either for profit or sport; the chase . . . ."  Oxford English Dictionary Online (2d ed. 1989); *accord* Webster's Third New Int'l Dictionary Unabridged (1981) at 1103 (defining "hunting" as "the act, practice, or an instance of chasing, taking, or killing wild and esp. game animals : CHASE").  And while field dressing follows close on the heels of the kill *chronologically*, it is arguably *conceptually* related just as closely, if not more so, to the process of butchering and meat preparation, which falls well outside the scope of Chapter 150.

Furthermore, that the act of field dressing occurs subsequent to the kill has special significance in light of the common law of wild animals.  Such animals "in a state of freedom" (*i.e.*, animals *ferae naturae*) are owned by "the state in its sovereign capacity as the representative and for the benefit of all its people in common," and "[u]pon this fact of public ownership rests, to a large extent, the governmental power of regulation of fishing and hunting . . . ."  35 Am. Jur. 2d Fish and Game § 1 (quoted in 1983 Ky. Op. Att'y Gen. 2-65, 1983 WL 166304, at *2 (Feb. 7, 1983)).  However, once a wild animal is "taken and reduced to possession," the property right in the carcass generally leaves the state and vests in the possessor.  *Ibid.*; *see also Pierson v. Post*, 3

Cai. R. 175 (N.Y. Sup. Ct. 1805).  At this point, the once-"paramount state concern" with that animal's welfare has clearly waned.  *Do*, 674 S.W.2d at 521.**⁶**

Finally, just as the Kentucky courts have traditionally viewed municipalities as possessing the power to regulate the discharge of weapons within their boundaries, the courts have also viewed municipalities as empowered to take local public health and sanitation measures.  *See Do*, 674 S.W.2d at 521–22 (noting that "[t]here is no broader field of [local] police power than that of public health" and that "Kentucky cases recognize the theory of concurrent [local] authority in [the] area[] of . . . public health").  Perhaps the paradigmatic local public-health measures are those regulating waste disposal.  *See Valley Vista*, 13 Cal. Rptr. 3d at 438 (noting that "local agencies through their traditional police power have [historically] played the dominant role in local sanitation matters . . . [such as] waste disposal.").  It is beyond dispute that the sanitary disposal of "blood and internal organs" falls within this core area of local concern.  If the General Assembly in enacting its wildlife code intended to implicitly preempt municipalities' traditional authority to dictate local sanitation measures tangentially related to wildlife, we believe that it would have said so.

Accordingly, we hold that the Field-Dressing Ordinance is not preempted by Chapter 150.

**c.  Deer-Feeding Ordinance**

We reach a different outcome with respect to the Deer-Feeding Ordinance. Sheffield correctly points out that the Ordinance's ban on "knowingly, purposely or intentionally feed[ing] deer" on "any public or private property" within the City of Fort Thomas directly conflicts with 301 Ky. Admin. Regs. 2:015, entitled "Recreational Feeding of Wildlife," which provides:

---

**⁶**We recognize that, notwithstanding the common law of property, it is "within the police power of [the state] Legislature" to enact laws "even to the extent of restricting the use of, or right of property in, the game after it has been taken or killed."  *Nicoulin v. O'Brien*, 189 S.W. 724, 732 (Ky. 1916). However, the question here is not whether it would be *permissible* for the state to regulate the treatment of animal carcasses — rather, it is whether the General Assembly intended, by adopting Chapter 150, to assert exclusive state control over the matter by implication.

(1) Wildlife may be fed year round in public areas not open to legal hunting or trapping, unless otherwise prohibited by an administrative regulation or municipal ordinance.

(2) *Wildlife may be fed year round within the curtilage of the home.*[7]

(3) Wildlife shall not be fed from March 1 through May 31 except as provided in subsections (1) and (2) of this section.

*Id.* § 2 (emphasis added). The Ordinance clearly "prohibits conduct which is [explicitly] permitted by" the regulation — the knowing, purposeful, or intentional feeding of deer within the curtilage of the home. *Louisville & Nashville R.R. Co.*, 488 S.W.2d at 330.

Defendants raise two arguments against preemption. First, they assert that, despite the administrative regulation's facial applicability to all "[w]ildlife," 301 Ky. Admin. Regs. 2:015 was actually intended to apply solely (or primarily) to wild turkeys, not deer. In support of this contention, they cite the Regulatory Impact Analysis and Tiering Statement prepared by the DFWR prior to the regulation's enactment.[8] This document does in fact contain a statement that 301 Ky. Admin. Regs. 2:015 is "necess[ary]" because it "enables law enforcement officers to more effectively enforce [another regulation] that prohibits the use of bait for hunting turkeys." 33 Ky. Admin. Register 1215 (Oct. 1, 2006). However, this is not the *only* reason the document gives as to why the regulation is necessary.[9]

And in any event, regardless of which animals the feeding ban was intended to protect, the specific provision permitting feeding within the curtilage of the home was

---

[7] The state regulation defines "curtilage" as "the area encompassing the grounds immediately surrounding any home or group of homes used in the daily activities of domestic life . . . ." 301 Ky. Admin. Regs. 2:015 § 1(2).

[8] Kentucky statutory law requires "[e]very administrative body [to] prepare and submit to the Legislative Research Commission . . . a regulatory impact analysis for every administrative regulation when it is filed with the Commission." Ky. Rev. Stat. § 13A.240(1).

[9] For example, that document also states that the regulation is necessary to "significantly lessen risks of disease outbreaks among *wildlife*," broadly speaking. 33 Ky. Admin. Register 1215 (emphasis added). Further, by the time the regulation made its way to the books, the statement of "Necessity, Function, and Conformity" in its preamble had abandoned any mention of turkey baiting and instead broadly read, "This administrative regulation establishes restrictions on the feeding of *wildlife* that will serve to protect *wildlife* from diseases and toxic substances that may cause harm to the *wildlife* population of left unregulated." 301 Ky. Admin. Regs. 2:015 pmbl. (emphases added).

clearly not intended for the benefit of the *animals* (which would presumably be best served by an absolute ban on human interference).  Rather, the telltale word "curtilage" demonstrates that this particular provision in the regulation was intended to guarantee the domestic interests of *property owners*.  *See Oliver v. United States*, 466 U.S. 170, 180 (1984) (describing the privileged constitutional status of the curtilage, i.e., "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life'") (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

Defendants also argue that even if the Deer-Feeding Ordinance is in direct conflict with Ky. Admin. Regs. 2:015, administrative regulations, as opposed to statutes, have no preemptive force.  The district court accepted this argument, noting that while the Home Rule Statute "specifically prohibits a municipality from enacting ordinances that conflict with constitutional or statutory provisions, . . . [it] is silent regarding a municipality's authority to act in the face of a conflicting administrative regulation." *Kelly,* 610 F. Supp. 2d at 778 (citing Ky. Rev. Stat. § 82.082). Relying on the canon that "a court may not insert language to arrive at a meaning different from that created by the stated language of a statute," the district court concluded that the Home Rule Statute's silence as to the preemptive force of administrative regulations means that they have no such force. *Ibid.* (quoting *Peter Garrett Gunsmith, Inc. v. City of Dayton*, 98 S.W.3d 517, 520 (Ky. Ct. App. 2002)) (emphasis omitted).

While the district court was quite possibly correct in its reading of the Home Rule Statute, we believe the district court erred by treating the Home Rule Statute as the beginning *and end* of the preemption question, rather than further considering the question in light of the common law of municipal-state relations.  Viewing the question from this broader perspective, we are satisfied that the Kentucky Supreme Court would hold that state regulations have the same preemptive force as statutes.

The relative powers of municipal and state governments under American common law were authoritatively described over 140 years ago by the preeminent local-government-law theorist (and Chief Justice of the Iowa Supreme Court) John Forrest Dillon:

> Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. . . . [Municipalities] are, so to phrase it, the mere *tenants at will* of the legislature.

*City of Clinton v. Cedar Rapids & Mo. River R.R. Co.*, 24 Iowa 455 (1868). Dillon observed that "[t]his plenary power on the part of the legislature over public corporations . . . is a doctrine so well settled that it is unnecessary to refer to more than a few cases asserting it." *Ibid.* As a result of municipalities' lack of "any inherent right of local self-government," a city generally had no power to pass a given ordinance without express permission from the legislature to do so (a principle that came to be known as "Dillon's Rule"). *See* 1 J. Dillon, Municipal Corporations §§ 98, 237 at 154, 448–49 (5th ed. 1911) (quoted in Note, *Municipal Home Rule for Kentucky?*, 54 Ky. L.J. 757 (1965–66)); *accord City of Bowling Green v. Gasoline Marketers, Inc.*, 539 S.W.2d 281, 284 (Ky. 1976).

It also followed directly from the status of municipalities as mere "*tenants at will* of the legislature," exercising their authority by legislative grace alone, that any municipal act in conflict with the legislature's superior enactments was null and void. *See Boyle v. Campbell*, 450 S.W.2d 265, 268 (Ky. 1970) ("An ordinance in conflict with a state law . . . is universally held to be invalid."); *March v. Commonwealth*, 12 B. Mon. 25 (Ky. 1851) ("A power vested by the Legislature in a city corporation . . . can not be considered as imparting by implication a power to repeal the laws of the State, or supersede them by any of its ordinances."). It was even stated that "municipal authorities . . . cannot adopt ordinances which infringe *the spirit of* a state law or are repugnant to *the general policy* of the state." *Arnold v. Commonwealth ex rel. City of Somerset*, 218 S.W.2d 661, 662 (Ky. 1949) (quoting 37 Am. Jur. *Municipal Corporations* § 165) (emphases added); *accord* 62 C.J.S. *Municipal Corporations* § 140 ("Municipal regulations . . . should not be repugnant to the established or public policy of the state.").

Because these common-law principles of municipal-state relations were fleshed out well before the rise of the modern administrative-regulatory state in the New Deal era, *see* William N. Eskridge, Jr. & John Ferejohn, *The Article I, Section 7 Game*, 80 Geo. L.J. 523, 540–41 (1992), Dillon's canonical treatment of the law of city-state relations does not specifically address conflicts between ordinances and *regulations*. However, given the common law's principle of absolute municipal subordination to the state — not just to the state's statutes, but also its "general policy" — we have little doubt that the common law would ascribe the same preemptive force to validly promulgated statewide regulations as it does to statutes. While sparse, the Kentucky case law from the pre-Home Rule era supports this conclusion. *See O'Brien v. Dep't of Alcoholic Beverage Control*, 206 S.W.2d 941, 943 (Ky. 1947) ("The Legislature . . . having chosen the Alcoholic Beverage Control Board as its agency, and having delegated to it the power to control and regulate [liquor licenses], we conclude that it was the legislative intent that the Board has a superior right [to the city's] to control [licensing].").

Indeed, the Kentucky Supreme Court has observed in a different context that "[a]dministrative regulations properly adopted and filed have the force and effect of law, . . . and . . . have the same effect as statutes . . . enacted directly by the legislative body from which the administrative agency derives its authority." *Rietze v. Williams*, 458 S.W.2d 613, 617 (Ky. 1970) (holding that rule that "one injured by a violation of a statute may recover from a defendant such damages as he has sustained by reason of [that] violation" also applies to violation of administrative regulation); *see also City of Owensboro v. Bd. of Trustees, City of Owensboro Employees Pension Fund*, 190 S.W.2d 1005, 1008 (Ky. 1945) ("Any law directly passed by the Legislature of a state, and any enactment to which a state gives the force of law, is [treated as] a 'statute of the state.'" (quoting *Fed. Trust Co. v. E. Hartford Fire Dist.*, 283 F. 95, 96 (2d Cir. 1922))).[10]

---

[10]The Missouri Supreme Court relied upon this very reasoning to reject the exact argument defendants assert here:

> Respondent . . . asserts that because departmental regulations are not the equivalent of statutory laws any conflict between the regulation and ordinance is not controlled by [preemption] principles. . . . [However, r]ules duly promulgated pursuant to properly

Treatises and other secondary authorities appear to be in agreement that state regulations have preemptive force. *See* 5 McQuillin, The Law of Municipal Corporations § 15:18 (3rd ed. 1978) ("In no event may a city enforce restrictions or regulations which are in conflict with the plain mandate of a legislative enactment *or state administrative regulations* promulgated pursuant to legislative authority." (emphasis added)); 62 C.J.S. *Municipal Corporations* § 141 ("Conflicts between regulations promulgated pursuant to properly delegated authority and ordinances are governed by the same principles governing conflicts between statutes and ordinances."); 56 Am. Jur. 2d Municipal Corporations § 328 ("A local ordinance . . . may be invalid because it conflicts with a state regulation if the state regulation has the force and effect of law.").

It also bears noting that under judge-made *federal-state* preemption doctrine, "[f]ederal regulations have no less pre-emptive effect [with respect to state laws] than federal statutes" so long as the regulations are "within the scope of the [agency's] delegated authority." *Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153–54 (1982). It would be surprising if the common law of state-local preemption were otherwise.

Of course, none of this would matter if Kentucky's Home Rule Statute, which does not mention preemption by administrative regulation, was intended to abrogate the common-law rules of preemption and impose a new, strictly statutory preemption regime. We are convinced, however, that this was not the legislature's intent.

The Home Rule Statute was enacted in 1980 in order to "obviate[] the need for the great number of statutes delegating specific powers which had previously been the only way the General Assembly could delegate powers to cities," and thereby "give

---

delegated authority have the force and effect of law. Respondent does not contest the authority of the agriculture department to promulgate the rules involved. [Thus, r]espondent's distinction between statutes and regulations is not persuasive . . . .

*Page W., Inc. v. Cmty. Fire Prot. Dist. of St. Louis County*, 636 S.W.2d 65, 68 (Mo. 1982); *accord Dail v. York County*, 528 S.E.2d 447, 451 (Va. 2000) ("A local ordinance may be invalid because it conflicts with a state regulation if the state regulation has the force and effect of law." (internal quotation marks omitted)).

cities in Kentucky far greater flexibility and authority to handle their local affairs than they ever had in the past."  J. David Morris, *Municipal Law*, 70 Ky. L.J. 287, 287 (1981–82).  The statute does this by granting municipalities a blanket authorization to adopt all non-preempted ordinances.  *See id.* at 293, 296.

While the Home Rule Statute purports to specify when a municipal ordinance will be preempted, the Kentucky Legislative Research Commission, an adjunct body to the state legislature, has opined that "[t]he [preemption] language [in the Home Rule Statute] merely *restates the well-established common law* in Kentucky on the relationship of local ordinances to state law."  Kentucky Legislative Research Commission, Informational Bulletin No. 145: Kentucky Municipal Statutory Law (Sept. 2003), *available at* http://www.lrc.ky.gov/lrcpubs/ib145.pdf (last visited August 20, 2010) (emphasis added).  Similarly, a leading scholarly article on the Home Rule Statute explains:

> Th[e Home Rule Statute's] approach [to preemption] does not represent a new concept. . . . *The drafters of [the statute] attempted to codify the common law rule of state supremacy over local governments . . . .*
>
> It is unclear if the courts will feel bound by [the Home Rule Statute's] *legislative restatement of [the] judicially formulated rule* [of state-local preemption].  Since the definition so closely parallels the common law rule, it may well be ignored and the courts may continue reconciling clashes between local governments and the state in accordance with the common law principles already developed.

Morris, *Municipal Law*, 70 Ky. L.J. at 299 (emphases added).  This article was written by the Committee Staff Administrator for the Kentucky General Assembly's Standing Committee on Cities shortly after the Home Rule Statute was enacted; *see id.* at 287 n.*; accordingly, it is perhaps the best window readily available into the contemporaneous intent of the legislature in enacting that statute.[11]  We therefore conclude that the preemption language in the Home Rule Statute does not set forth the exclusive

---

[11]Moreover, this article has been cited by the Kentucky Supreme Court in explicating the Home Rule Statute.  *See Dannheiser v. City of Henderson*, 4 S.W.3d 542, 549 (Ky. 1999).

conditions under which a Kentucky municipal ordinance may be preempted, and that the common-law rules still have independent force.

This is consistent with the reality that the Kentucky Supreme Court, even after the Home Rule Statute's enactment, appears to take for granted that agency regulations are capable of preemptive effect. In *Lexington Fayette County Food and Beverage Association*, a 2004 decision, the Kentucky Supreme Court held that "[a] careful examination of the . . . ordinance . . . as compared to the [state] statutes *and regulations* involved indicates that the local authority has not adopted an ordinance which conflicts with any statute *or regulation* in the individual fields sought to be controlled." 131 S.W.3d at 750 (emphases added). And in *Whitehead v. Estate of Bravard*, the Kentucky Supreme Court noted that "[i]f the state has . . . set a local license quota *by regulation* [of the Alcoholic Beverage Control Board] . . . , the state has 'moved in'" and a locally fixed license quota is preempted. 719 S.W.2d 720, 723 (Ky. 1986) (emphasis added). While it does not appear that any party disputed the ability of regulations to preempt ordinances in these cases, the court's unstated assumption that preemption by regulation is still possible reinforces our conclusion that the Home Rule Statute is not the alpha and omega of the preemption analysis.[12]

Accordingly, we hold that 301 Ky. Admin. Regs. 2:015 has preemptive force and that the Deer-Feeding Ordinance is preempted insofar as it purports to ban deer-feeding within the curtilage of Fort Thomas homes. However, we do not find the Deer-Feeding Ordinance preempted in its entirety, as it is a legitimate exercise of municipal authority as applied to deer-feeding *outside* the curtilage of the home. No state statute or regulation is in direct conflict with such a scaled-back prohibition. Nor can it be argued that a ban on deer-feeding outside the curtilage of the home is implicitly preempted by Kentucky's "comprehensive scheme" of wildlife legislation, because Ky. Admin. Regs.

---

[12]In a footnote, the decision below acknowledged the existence of these cases, but reasoned that they stood only for the proposition that municipal ordinances may be preempted when they "conflict[] with statutes and regulations which in tandem make up a comprehensive scheme of legislation," as Kentucky's liquor laws do. *Kelly*, 610 F. Supp. 2d at 779 n.1. We see no support for such a conclusion. Validly enacted regulations embody the vicarious policy of the General Assembly and have the force of law, whether promulgated pursuant to a comprehensive statutory scheme or pursuant to a single, narrow enabling statute.

2:015 § 2(1) explicitly recognizes municipalities' authority to prescribe local wildlife-feeding rules not inconsistent with that regulation. *Ibid.* (stating that wildlife may be fed in public areas "unless otherwise prohibited by . . . municipal ordinance"); *see Do*, 674 S.W.2d at 521 (reasoning that no preemption exists where "[t]he state statutes indicate a desire for local action in that area").

We therefore sever the preempted applications of the Deer-Feeding Ordinance by construing the phrase "any public or private property" in Fort Thomas Code § 91.51(A) to exclude the curtilage of Fort Thomas homes — i.e., "the area encompassing the grounds immediately surrounding any home or group of homes used in the daily activities of domestic life . . . ." 301 Ky. Admin. Regs. 2:015 § 1(2). Thus construed, the ordinance is valid and remains in force.[13]

## B. Constitutional Claims

Sheffield's remaining claims arise under the Due Process Clause of the United States Constitution and § 2 of the Kentucky Constitution,[14] which are generally construed in tandem. *See, e.g.*, *Holder v. Robbins*, No. Civ.A. 05-328-JBC, 2006 WL 751238, at *7 (E.D. Ky. Mar. 21, 2006); *Moore v. Ward*, 377 S.W.2d 881, 885 (Ky. 1964). We do so here.

### 1. *Substantive Due Process Challenge to the Bow-and-Arrow Ordinance*

Sheffield argues that the Bow-and-Arrow Ordinance violates or burdens his "fundamental right to be free from bodily harm," because "allowing hunting in the residential area around his home put[s] his personal well-being in danger." Appellant's Br. at 31-32. We disagree. It is settled law that "[a] legislative decision that has an

---

[13]*See* Fort Thomas, Ky. Code § 10.07 ("It shall be considered . . . the intent of Council in enacting any ordinance, that if any part of the ordinance be held unconstitutional the remaining parts shall remain in force . . . ."); *Commonwealth v. Beasy*, 386 S.W.2d 444, 448 (Ky. 1965) (holding that preempted portions of an ordinance may be severed where "the remaining portions of the ordinance are not so essentially and inseparably connected with and dependent on the invalid part, or so incomplete and incapable of standing alone, as to make it apparent that the [city] would not have enacted the remaining parts without the invalid part" (citing and applying Ky. Rev. Stat. § 446.090)).

[14]That constitutional provision states that "[a]bsolute and arbitrary power over the lives, liberty and property of freemen exist nowhere in a republic, not even in the largest majority."

incremental impact on the probability that death will result in any given situation—such as setting the speed limit at 55-miles-per-hour instead of 45—cannot be characterized as state action depriving a person of life just because it may set in motion a chain of events that ultimately leads to the random death of an innocent bystander." *Martinez v. California*, 444 U.S. 277, 281 (1980). The same is no doubt true for legislative decisions that merely increase the probability of bodily harm, rather than death.

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), which Sheffield cites in support of his argument, is not to the contrary. In that case, we held that three undercover police officers' substantive-due-process rights were violated when an employee of the City of Columbus disseminated sensitive information from their personnel files to members of a violent gang. *Id.* at 1059. As Sheffield notes, we observed in *Kallstrom* that a state "may not cause or greatly increase the risk of harm to its citizens [at the hand of private actors] without due process of law through its own affirmative acts." *Id.* at 1066.

However, because "many state activities have the potential to increase an individual's risk of harm" by private actors, we restricted the application of this so-called "state-created danger" doctrine to scenarios where (1) there is a "special relationship [such as warden-prisoner] between the state and either the [plaintiff] or the private tortfeasor"; or (2) the state's actions cause a "special danger" to the plaintiff, i.e., "place [him] *specifically* at risk, *as distinguished from a risk that affects the public at large*." *Id.* at 1066 (emphases added). Sheffield does not claim any special relationship, and nothing in the record establishes that the Bow-and-Arrow Ordinance places *him* "specifically at risk," as distinguished from the citizenry of Fort Thomas at large. Accordingly, Sheffield has not established a cognizable infringement of his fundamental rights.

Even "legislation that does not proscribe fundamental liberties nonetheless violates the Due Process Clause" where it imposes burdens without any "rational basis" for doing so. *United States v. Comstock*, 130 S. Ct. 1949, 1966 (2010) (Kennedy, J., concurring); *see also Craigmiles v. Giles*, 312 F.3d 220, 223–24 (6th Cir. 2002).

However, enactments that do not encroach upon fundamental rights "[are] endowed with a presumption of legislative validity, and the burden is on [the challenger] to show that there is no rational connection" between the enactment and a legitimate government interest. *Harrah Ind. Sch. Dist. v. Martin*, 440 U.S. 194, 198 (1979); *see also Craigmiles*, 312 F.3d at 223–24.

Sheffield argues that the Bow-and-Arrow Ordinance lacks a rational basis because the City, inter alia, acted without the support of evidence, ignored a scientist's warning that the Ordinance would be ineffective, and failed to conduct a count of the local deer population. However, to pass rational-basis scrutiny, ordinances need not be supported by scientific studies or empirical data; nor need they be effective in practice. *See ibid.* Rather, "[i]t is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Kutrom Corp. v. City of Center Line*, 979 F.2d 1171, 1174 (6th Cir. 1992) (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 487–88 (1955)); *see also Craigmiles*, 312 F.3d at 224 ("[W]e will be satisfied with the government's 'rational speculation' linking the regulation to a legitimate purpose . . . ." (quoting *FCC v. Beach Comm'cns, Inc.*, 508 U.S. 307, 313 (1993)). Reining in the deer population of Fort Thomas is clearly a legitimate government purpose, and it would not have been wholly irrational for the City Council to conclude that allowing arrows to be discharged within city limits would further that purpose — especially in light of the DFWR's counsel that this was the *best* manner of doing so.

### 2. *Vagueness Challenge to the Deer-Feeding Ordinance*

Sheffield also argues that the Deer-Feeding Ordinance is so vague as to offend the constitutional guarantee of procedural due process. A penal statute or ordinance is unconstitutionally vague where it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2718 (2010); *see also Commonwealth v. Foley*, 798 S.W.2d 947, 951 (Ky. 1990). However, "perfect clarity and precise guidance have never been required" of a penal

statute or ordinance in order to pass constitutional muster, *Humanitarian Law Project*, 130 S. Ct. at 2719 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)), especially where that enactment does not "interfere[] with the right of free speech or of association," *ibid.* (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)).

Sheffield's objection to the language of the Ordinance is that its first paragraph proscribes "knowingly, purposely or intentionally feed[ing] deer," while its second paragraph states that "[a] person shall be deemed to have knowingly, purposely or intentionally fed deer" if, inter alia, he "*allows* [edible material] to be placed . . . within the reach of deer." Ft. Thomas, Ky. Code § 91.51 (emphasis added). According to Sheffield, the second paragraph specifies behavior with a "lower mens rea requirement" than the first, such that the Ordinance as a whole "fail[s] to establish a clear [overall] level of mental intent . . . ." Appellant's Br. at 28, 30. However, even assuming that the Ordinance prohibits both intentional and negligent conduct, this alone does not make it *vague*; the Ordinance still "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trustees*, 411 F.3d 777, 798 (6th Cir. 2005) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

## IV. CONCLUSION

For the reasons discussed above, the district court's judgment is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings consistent with this opinion.